## HARNISCHFEGER CORPORATION v. HOOSIER MORTGAGE SERVICE, Inc.

### No. 10018.

United States Court of Appeals
Seventh Circuit.

May 8, 1950.

Charles W. Cook, Jr., Indianapolis, Indiana, for appellant.

James A. Ross, Robert D. Risch, Indianapolis, Indiana, Ross, McCord, Ice & Miller, Indianapolis, Indiana, of counsel, for appellee.

Before MAJOR, Chief Judge and LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This appeal presents two issues. (1) Whether the defendant, Hoosier Mortgage Service, Inc., was bound by the execution, by Fred I. Hueber, the manager of its Fort Wayne branch office, of certain "Bank Letters of Credit" by which defendant promised the plaintiff that defendant would pay for certain prefabricated houses and material within thirty days after their delivery to Ottawa Builders, Inc., to which corporation plaintiff was selling said houses and material. (2) Whether defendant's promises to make such payments were *ultra vires*.

The complaint alleged that during the months of April through June, 1947, Ottawa Builders, Inc., an Ohio corporation placed orders with plaintiff, Harnischfeger Corporation, a Wisconsin corporation, for sixteen prefabricated houses and certain materials which were to be delivered to Ottawa Builders, Inc. at Ottawa, Ohio, the price of which amounted to a total of $57,938.87, of which sum $37,544.45 had been paid leaving unpaid the balance of $20,394.42 demanded in this action; that the plaintiff shipped the houses and materials, relying on the undertaking of the defendant that it would pay for all of such houses and materials within thirty days after delivery; and that the undertaking of the defendant was contained in sixteen separate written instruments on which the action was based.

Each of these undertakings was addressed to the Harnischfeger Corporation, described the model of the house, to whom it had been sold, the place where it was to be erected, and stated that: "This institution herewith advises that it will remit to cover the materials you supply for a PH Pre-Assembled Home within thirty days after delivery." Each undertaking was signed "Hoosier Mortgage Service, Inc." by Fred I. Hueber, Manager. Hoosier Mortgage Service, Inc. was incorporated under the laws of Indiana in October, 1940, as a mortgage service company.

In this business it solicited and negotiated mortgages which in most instances were insured by the Federal Housing Administration. Usually the defendant secured a temporary loan from some bank to construct the improvements on the property to be mortgaged. The bank advanced construction funds to the defendant under a contract with the defendant and was secured by a mortgage on the property in question. After the improvements were

completed and all bills on the construction paid, another mortgage was then negotiated with an "ultimate mortgagee". The funds from such mortgage were used to pay off the mortgage held by the bank which had advanced the construction funds, and to pay the defendant for its services.

The principal office of the defendant was in Indianapolis, Indiana. In January, 1946, the defendant opened a branch office in Fort Wayne, Indiana, and placed Hueber in charge thereof as manager. Prior to his employment by the defendant, Hueber had worked several years for the Federal Housing Administration and was thoroughly familiar with the mortgage business.

Early in March, 1947, M. O. Bigley, Vice-President of Ottawa Builders, Inc., came to Indianapolis to the office of the defendant to investigate the possibilities of securing from the defendant construction funds with which Ottawa Builders, Inc. would build sixteen houses in Ottawa, Ohio, located forty miles east of Fort Wayne. In the Indianapolis office of the defendant, Bigley talked to Kenneth L. Overfield, defendant's Vice-President, who sent him to Fort Wayne to take the matter up with Hueber. On this occasion Bigley was accompanied by Weisenbarger, another officer of Ottawa Builders, Inc. Bigley and Weisenbarger went to Fort Wayne the same afternoon and completed the arrangements for such financing with Hueber.

On the construction of the houses here involved the defendant first advanced $2,500 of its own money and thereafter advanced money furnished to it by the First Central Trust Company of Akron, Ohio (which later became The First National Bank of Akron). Hoosier was assisted in its financing by this bank under an agreement providing in part that: Hoosier would select, endorse in blank, and deliver to the bank, notes given Hoosier by approved contractors; Hoosier would deliver to the bank the mortgage deed, duly recorded, which secured the notes, with an assignment of the mortgage deed and satisfactory evidence of good title; funds advanced by the bank would be disbursed in a certain manner; as to every note and mortgage in which the bank acquired an interest Hoosier and Weidlich guaranteed that the dwelling on the mortgaged property would be completed within a reasonable time in accordance with the plans and specifications therefor; within ninety days after completion of each dwelling the note and mortgage held by the bank on that property would be refinanced and the bank paid in full; and every note and mortgage becoming delinquent in any manner would be re-purchased from the bank, upon its demand, for the total of all previous advancements made by the bank, plus interest thereon, plus all out-of-pocket expenses reasonably incurred.

After all arrangements had been made between Hoosier and Ottawa for the financing of the construction of the sixteen houses here in question, and the prefabricated houses had been ordered by Ottawa, a representative of the plaintiff came to the Fort Wayne office of the defendant with the bank letters of credit "all made out and ready for the signature of the defendant". The signature of the defendant was placed on these instruments by Hueber, as manager, and thereafter the sixteen houses and certain material therefor were shipped by the plaintiff to Ottawa and the houses were constructed on the real estate belonging to Ottawa. A copy of each of the invoices on these houses was sent to the home office of the defendant, pursuant to the request of Meadows, the defendant's secretary.

The first seven houses completed were paid for either by defendant sending a check for such payment to Ottawa or directly to the plaintiff. The check sent to plaintiff bore the signature of defendant by "Fred I. Hueber, Manager."

It is conceded that Fred I. Hueber, the manager of the Fort Wayne office, did not have express authority from the defendant to sign the bank letters of credit here in question. However, the record contains substantial evidence to support a finding and conclusion by the trial court that in signing these letters of credit Hueber was acting as the agent and representative of the defendant under implied and apparent authority.

Hueber was in general charge of the defendant's Fort Wayne branch office as manager, and in that position he solicited, negotiated and serviced mortgage loans on behalf of the defendant. Bigley testified that on his first visit to defendant's Indianapolis office he had explained to Overfield, the defendant's Vice President, that Ottawa was going to use prefabricated houses; and that he and Weisenbarger discussed with Overfield the possibility of their having to pay sight drafts on the houses on delivery, of having to put up a deposit of either $200 or $500, and the possibility of obtaining credit for thirty days. Bigley further testified that Overfield then told them they should go to Fort Wayne and see Hueber who took care of that territory and "had full authority", after which Overfield called Fort Wayne and made an appointment for them to see Hueber that afternoon. Bigley also testified that the terms he was discussing with Overfield were the terms on which Harnischfeger sold prefabricated houses.

All of defendant's officers testified that the defendant had pevious experience with financing construction where prefabricated houses were used and that it was the general custom of makers of prefabricated houses that such houses had to be paid for in cash on delivery.

Hueber testified that, as manager, in general charge of defendant's mortgage business in the Fort Wayne territory, he had authority to and did sign checks on the defendant's checking account; that he had authority to sign the name of the defendant to F.H.A. applications and other papers concerning loans; that he was given this authority in 1946, when he was placed in charge of the Fort Wayne branch office; and that he collected money for the defendant, deposited it, disbursed part of it, forwarded part of it to the Indianapolis office, and made payments from defendant's funds to the mortgagees.

He testified that prior to this transaction with the plaintiff he had always been required to disburse the full cost of prefabricated houses before they were delivered on the ground to the contractor; that

in all cases of prefabricated houses used prior to that time they were shipped to the contractor c. o. d.; and that he, therefore, took it for granted that it was all right to sign the name of the defendant to these agreements, the only effect of which would be to postpone payment for thirty days and thereby save the contractor the payment of interest for the thirty days.

Hueber's authority to make this construction loan to Ottawa, involving the use of sixteen of plaintiff's prefabricated houses, is not questioned. His authority to make the loan necessarily included the authority to do acts which were incidental to, or reasonably necessary in making such loan. American Telephone & Telegraph Co. v. Green, 164 Ind. 349, 357, 73 N.E. 707; Exchange Bank of Warren v. Weiner, 92 Ind.App. 692, 170 N.E. 788; Restatement of Law of Agency, § 35; 2 Am.Jur. § 108, p. 91. The evidence shows that the execution of these letters of credit guaranteeing payment for the houses was incidental to and reasonably necessary in making this loan, and this action by Hueber was therefore within his implied authority.

The evidence discloses the fact that a copy of each of the invoices from plaintiff for the houses and material was sent to Meadows, the secretary of the defendant, and that on each of said invoices the terms of the purchase were shown as follows: "BL/C Hoosier Mortgage Service, Inc." Meadows testified that he did not understand what this meant. But, when we consider the evidence of Bigley that he had talked to Mr. Overfield and explained the terms under which the plaintiff would furnish prefabricated houses and material, the fact that all of the officers of the defendant admitted that it was the usual practice of manufacturers of prefabricated houses to require payment of cash on delivery, and the further fact that the defendant did require that a copy of each of plaintiff's invoices be sent directly to it, a requirement not made as to the other firms furnishing materials, we are of the opinion that the facts were sufficient to support an inference and conclusion by the trial court that the officers of the defendant corporation under-

stood and acquiesced in the action of Hueber in signing these letters of credit.

Under defendant's contract with the Akron bank it had guaranteed that the construction on the improvements on these properties would be completed. Its officers knew that the improvements could only be completed by the contractor buying, paying for and constructing these houses. Defendant's officers knew that this particular contractor was using prefabricated houses and they, therefore, must have known that the houses would either have to be paid for on delivery, or that the defendant would have to guarantee payment. Since they must be held to have known that payment for these houses was not made on delivery, the trial court could properly infer that the defendant knew that Hueber, their Fort Wayne manager, had, in some manner, guaranteed payment.

Since the evidence was sufficient to support a finding that the defendant knew that Hueber, its Fort Wayne manager, had guaranteed payment for these houses, and, instead of repudiating such action, permitted the use of plaintiff's houses, thereby accepting the benefits of Hueber's action, the trial court could have properly concluded and held that the defendant had ratified Hueber's action and was thereby bound. This would be true even if there had been no prior implied or apparent authority for Hueber to execute these instruments. Seymour Improvement Co. v. Viking Sprinkler Co., 87 Ind.App. 179, 161 N.E. 389; 10 Am. Jur. § 208, p. 165.

It also seems clear that the execution of these letters of credit was not *ultra vires* on the part of the defendant corporation.

Article 2 of the Articles of Incorporation of the defendant expressly stated that one of the purposes of the defendant corporation was to guarantee and to sell and assign securities or evidences of indebtedness of any other corporation. The execution of these letters of credit was a form of guaranteeing the indebtedness of the Ottawa Builders, Inc., and was necessary in selling the notes and mortgages of Ottawa to the Akron bank.

Since the action of the defendant corporation was not *ultra vires* and since the execution of the letters of credit by Hueber was as agent and representative of the defendant corporation, the judgment of the District Court must be, and is, affirmed.